Case No. 15-1231 et al., CC1 Limited Partnership, DBA Coca-Cola Puerto Rico bottlers, Petitioner, National Labor Relations Board, Mr. Mendez Gomez for the petitioner, Mr. Byrd for the respondent. Ah, counsel, could I just, counsel in the first case, sorry, I want to express the court's appreciation for your assistance in handling this matter. Thank you. Good morning. My name is, may it please the court, my name is Nestor Mendez Gomez, and I represent the petitioner and cross-respondent in this case, CC1 Limited Partnership. Your Honors, this case, in essence, involves a wildcat strike. All three board members that rule on the case, the two majority members and the dissenting member, agreed on that point. The disagreement was whether it was a protected conduct under Section 7 of the National Labor Relations Act, or whether instead it constituted a lawful basis for termination under Section 8. The two board members that justify the undisputedly unauthorized strike, in essence argued that because the exclusive representative, the Teamsters Union in that case, had authorized a strike more than a month before, a dissident faction of the union could, for all intents and purposes, decide when and where to exercise that strike vote. Well, is the word dissident yours or the board's? Excuse me? Is the word dissident yours or the board majority? Well, there was a dissident faction. Well, I don't think that's the way they look at it. I think the bottom line was that the union, the exclusive representatives, was following a different strategy than a group. Actually, though, you know, in our standard of review here, given our standard of review, the majority found that the union had three goals, and those were the same that this group that you're referring to had. The evidence really showed that the original three goals that the union had, and on which the strike vote was voted on on September 15, were, number one, to continue to bargain the collective bargaining agreement, number two, to reinstate the shop stores that had been suspended at that point in time, and three, to prevent any charges against the union. Those were the three initial goals. What happened was that after the October 3 election that the union held, the group of the stewards and the union split their intents and purposes. Although some of the goals – But the board found that they had the same goals. That's a finding. And the standard of review by which we examine that is whether there's substantial evidence. And that doesn't take a whole lot. The congruence on the general goal, for example, of continuing to negotiate, does not trump the union's right to decide when to strike. And, indeed, what the dissident group did was when they held a competing assembly with the union's October 12 assembly, which was, by the way, to elect a new bargaining committee that would substitute – Maybe you answered Judge Rogers' question on this and I didn't hear it, but you keep calling them a dissident group. Did the board majority ever refer to them in those terms as a dissident group? The dissident member did. They used the word dissident group. Yeah. The board majority. Yeah. It specifically said that it was a dissident group. In that October 12 meeting, that competing meeting that they held, in spite of the fact that the new business representative told them, do not divide the membership and do not take a strike vote, they warned them that on October 9th the business representative told the competing group, which had announced that they would hold an election the same day that the union had announced that they were going to hold an assembly. After they were warned of that, they went ahead, held a meeting, and took a strike vote that – and this is where I disagree that the goals were the same – put first and foremost, subject to a strike, the immediate reinstatement of the stewards. As a second goal, and this is in the dissident opinion and it's in the appendix, I think, 248, the second goal was to have the sub-stewards, which were the original bargaining committee, be in charge of the negotiations. Those were the two goals that were voted on on October 12, which were different from the original September 15 vote. Indeed, that same day, the union, in their own assembly, did not hold a strike vote, did not decide that they should go ahead with the September 15 vote. So you have the union, the same day, proceeding with their assembly, not holding a strike vote, and you have the dissident group deciding we're going to go to strike unless you immediately reinstate the sub-stewards, unless you put the sub-stewards in charge of the negotiation. Well, I thought the response, though, or the evidence, was that those were the members of the negotiating committee at that time. No, well, not correct. The original committee included Mr. Lopez, who was involved in the work stoppage. He was terminated on October 6 by the union and substituted for Mr. Vasquez. So at least one of the members of the bargaining committee, indeed the lead member, the business representative, had been substituted by October 12. Two, the union had called the October 12 meeting precisely to elect new bargaining members to substitute the rest of the members, which were the stewards. So clearly the new committee had yet to be. . . I agree with that. Yet the union went ahead when, on October 13, the company told the membership directly, we're going to negotiate. The union and the company exchanged letters, October 15 and 16, that were posted on the bulletin board that they were going to go ahead and negotiate. So at that point in time, it was the union, through the offices of the union. In fact, it was signed, the letters were signed by the new business representative and the attorney of the company that they were going to go ahead and negotiate October 15 and 16. In the meantime, the dissident group is saying, no, no, no, don't go ahead and negotiate unless you immediately reinstate the shop steward. That was their number one goal. So what really happened here is that the group of the stewards decided to derail, I would say almost boycott. . . Can I ask you this question? The agreement that had been made between the company and the union. . . Could I ask you this question? Yes. So let's suppose that I think, and you might disagree with this, but just indulge my assumption. Let's just suppose that what has to happen is the employees have to know that what they're doing is in conflict with what the union wants to have done. Let's just assume that. Then the first evidence that I see in the record that employees might have become aware that what they're doing by striking is in conflict with the union's wishes is during the strike. And on the first day of the strike, the employer, your client, reaches out to the union and says, what's going on? There's a strike. And then the union responds and says, I don't know. This isn't something that we authorize. And it uses some language in the letter that makes clear that the union didn't support the strike. And then the employer, your clients, the security guards apparently distributed that letter to the striking employees. So at that point, there's an argument that the employees were aware that what they were doing was in conflict with the union's desires. And my question is this. As I understand it, some of the employees, after they received the letter, stopped striking and went back to work. Correct. Are any of the employees that are still an issue in this case those employees? No. No, they're not. The ones at issue precisely were the ones that continued to strike for two more days after that formal, specific, clear notice that you just described. But I would add that not only did the four employees at issue here that were terminated for continuing for those two days, not only did they get that notice, those four employees also knew before that time, at least by October 13, that what the company wanted to do was negotiate during a meeting held on October 13 where all of the members were told by the company, by Mr. Trigueros, we want to negotiate. They responded, oh, but we want you to negotiate directly with the shop stewards. Okay. So there they knew that there was at least a conflict or an initial conflict and a proposal for direct negotiation, which is against Section 9. But then subsequently on October 14 and 15, the letters between the company and the union are exchanged and posted on the bulletin boards, that's notice to all of the members, that they were going to start the negotiations. Okay. For the bargaining committee, in those letters, there was no mention of the reinstatement of the stewards. So you have the union, the exclusive representative, we're going to go ahead with the negotiations. We're not going to strike. We're not going to condition the reinstatement of the stewards to the negotiation. We're not going to stop the negotiations because of it, nor are we going to strike because of this. Where are you getting the we're not going to strike part? Excuse me? You added in we're not going to strike, and where's that coming from? Well, that's coming from the October 15 and 16 letters did not mention any condition on the negotiations. Okay? On the October. But there's no guarantee that there's not going to be a strike either. Oh, no. I agree. I agree. But I think the confirmation of what happened here is that once those letters are out, once there's negotiation that starts, or at least there's an agreement to start on October 16, you have the dissident group meet at the house of one of the stewards and plan to strike the next day with the group of the 50 that signed that requirement and that we're going to strike unless you reinstate number one and unless you name us, the shop stewards, to negotiate. That happened October 19. Okay? At that time, everyone in that meeting that then subsequently went to the strike the next day, the ones that approved the strike, the ones that planned the strike, the ones that signed that agreement, knew that the union and the company were already agreeing to negotiate without conditioning that or without imposing a strike. But regardless, on the morning of the first day, there was a clear-cut letter from my client to the union saying, hey, you agreed not to strike. Okay? And two, you agreed to negotiate. And then there's a response that was distributed to everyone from the union. We agreed to negotiate. And then in the last paragraph of that letter, which if anyone had any doubt, is where they then very forcefully say that there's a subgroup that are false leaders and that are basically calling this strike because of their own ignoble interests, which is the translation for the shop stewards' dissident group that wanted their immediate reinstatement and had forced the strike as opposed to the continuing of negotiation without a strike, or at least without a strike that day. All right. Shall we hear from the board? Let us hear from the board, and we will give you some time on rebuttal. Thank you. May it please the Court, good morning. My name is Jeff Bard. I'm here on behalf of the National Labor Relations Board. Your Honors, when Miguel Colon participated in the September 9 work stoppage and when the employees the following month engaged in a strike, they were engaged in activity designed to engage in mutual aid and protection for one another's benefit and therefore was protected by Section 7 of the Act. Now the board, as it's charged with, also balanced the employees' Section 7 rights against the principle majority rule set forth in Section 9A of the Act in determining whether the strikers, because they had engaged in October in this action that was unauthorized by the union, balanced within the sphere of its expertise those rights and had a long-established test for doing so, applied that test, and based on substantial evidence found that while this action was unauthorized, in fact it was neither inconsistent with the union's position. Well, how could you say it was inconsistent with the union's position when the union had decided, at least at that point in time, not yet to strike and the wildcatters went ahead and struck? Isn't that a fundamental inconsistency there? Well, I don't know that I would characterize it as a fundamental inconsistency. To decide whether to strike or not, that's the biggest weapon you've got, right? And the union, for whatever reason, had decided at that point in time not to strike. The wildcatters went ahead and struck. Why isn't that fundamentally inconsistent? Because what the board looks to in determining whether there's an inconsistency is what are the union's established objectives? This is the language that the board has used. It's the language that the circuit has used. Well, it's not merely outcomes. It's also process. It's also strategy to reach those outcomes. Right. And the argument is that the union had decided, at least at that point in time, that a strike was not the best way to reach those outcomes. The wildcatters decided to maybe reach those outcomes, but decided in a fundamentally different way. Why isn't that so inconsistent that it's irrational to say that the ---- I apologize. Your Honor, I believe that the term inconsistency is used here. It's akin to a term of art as the board's developed it. In looking at, again, the balancing of the employee's rights. And the employees, by electing an exclusive bargaining representative, as they had done here, do not forfeit all rights to engage in Section 7 activity. And so the question is whether they did so in such a manner that it undermines the union's rights. So following up on Judge Griffith's question, so suppose you have a situation in which the goals are the same. Let's say the ---- let's call them just that an employee's just for ---- Which I would not agree with that. Sure. I don't know how else to describe them, the wildcat striking employees, the wildcatters. Let's just suppose that the union actually gives them a correspondence ahead of time that says, we don't think a strike is a good idea. We don't condone a strike. In fact, we prohibit a strike from our employees. Yes, Your Honor. And then the employees say, okay, you don't want us to strike, but you know we have the same goal in mind. We want to get higher wages. We're going to go on strike. We think a strike is a good idea. I don't think that you would take the position that that's still okay because the goals are the same. Your Honor, I will first say, if you'll allow me, that this is, of course, a hypothetical situation the Board would have to address in the first instance. That would be a significant fact for the Board to add into the mix because it is a fact that is completely absent here. But is there any doubt? I guess it sounds to me like you're saying that that's a situation in which the Board might actually conclude that because the goals are consistent, it's totally fine that the union says don't strike and the employees strike anyway. No, I think that the case law shows that a fact like that would make it would be difficult, although I'm just saying this for my client to decide. What's the difficulty? I don't understand why you're even carving out difficulty. What's the argument that it's okay for unions? If the exclusive bargaining, if it's a balance between Section 7 and Section 9, if Section 9 means anything, it seems like it would have to mean that if the exclusive bargaining rep says don't strike and the employee says I'm striking and, by the way, I have a Section 7 right to do it, the employer seems like they could act on the assumption that the exclusive bargaining representative, the Section 9 representative, is saying don't strike. Yes, Your Honor. All I can say is that I agree with you. It's very difficult to see how there is anything but a square inconsistency there, but I cannot bind my client to an outcome in a future case that's not presented here. Yeah, I appreciate that. But I understand that had that notice been given from the union to the members that the union has a duty to fairly represent, the case would be different. So then if that's true so that, as Judge Griffith raised the possibility, that there's an inconsistency between the union and the employees, in this case it seems like that kind of notice was received by some of the employees on the first day of the strike because they got the letter from the union to the employer that says we don't condone the strike. Yes. And at that point, what's the argument that it's not exactly the hypothetical that I laid out? The only distinction I can see is that as a matter of historical fact, the person who gave the employees the letter was a security guard employed by the employer as opposed to a union rep. Yes. And that's in a footnote in the board's opinion. Well, but it's also the fact, of course, that this is a communication during ongoing bargaining because even though the actual bargaining at the negotiating table had stalled, the relationship between the company and the union is one of bargaining. During the course of that bargaining, the company on October 20th stated that what's going on here and the union responded directly to the company. Now, the union had never provided that to its own members despite having had notice for nearly a week at that point that the union or that the employees had held another meeting and created a petition to strike, had furnished that to the union. The union did not respond to the employees to tell them, as we discussed earlier, that type of fact that do not do this. This is not the way we would like to proceed. It sounds like the distinction then you're making is the one that was suggested, which is that the correspondence didn't go directly to the employees from the union. It went circuitously to the employees because it first went to the employer, and the employer gave it to the employees. Well, I mean, that is true. It's not simply the mere fact of the route it traveled, however. It was that it was directed to the company in the discussions of whether they would resume negotiations. Now, the board also— Hey, we just gave this to the company. We're not behind the strike. I mean, that would be—that would also be a different scenario than we have here because that's the union standing behind its words as a message to the members that it has a duty to represent. And so, therefore, they're sanctioning it in a way that is not sanctioned when they tell this to the company in the back and forth over discussions of resuming bargaining, reinstating the stewards, and meeting the demands that the union has put forth. The union had every opportunity at multiple stages to disavow its established rights. And never asked them to stop. Isn't that right? And never asked them to stop. Now, this is what sets this case apart from some of the others that we've bantered about in our briefs, and that is that this isn't a situation where there's a question of the union's objectives. The union and the union's leadership established these objectives and never took a step back from them. Now, arguably, the point at which they may have came closest to doing so was this October 20 letter at the beginning of the strike, but as we've already discussed, it wasn't communicated directly. Now, there were intervening events as the company. Some employees obviously assumed that the letter reflected the union's wishes because they stopped striking, right? Right. They absolutely may have. That might have been their interpretation, certainly. There's not direct evidence on exactly who or why they did return, but there seems to be an inference as the board set it out, although I don't believe they termed it an inference. I'm just trying to understand what the board's position is here, that the union writes the employer a letter saying, we're not authorizing a strike, and the employer makes that available to the employee, and there's no question the letter is a fake. Oh, no, no, no. Nothing like that. No. So at that point, just so I'm clear here, why isn't the employer properly in the position of taking the position that the employees who continue to strike after they have seen this letter are not protected? I mean, what's the board's theory here? The board says, well, you know, the union didn't do anything to tell the employees directly, or that it had changed its position regarding a strike, yet it had told the employer that this was not an authorized strike. Well, I mean, it's not for the company to — the company didn't hear directly from the employees. The company heard the union's position and simply summarily fired the employees despite — Here's what I'm trying to — I have a company. The employees are unionized. I'm trying to figure out what's going on here, so I get a communication from the union that said, we have not authorized this strike. All right? I share that with the employees so they know that this is not an authorized strike, and yet some employees continue to strike. The board has carved out a situation in which — or carved out room for unauthorized activity to remain protected by Section 7, and so the mere fact that the company had learned that this was not unauthorized does not conclusively establish that there is the type of inconsistency that has — No, but that — we already went through that, because I think as long as the communication would have gone from the union to the employees directly, then it becomes very difficult to say that the employees could continue striking. Right? So the distinction is, as far as I can tell, and this is what Judge Rogers is saying, the only distinction that the board makes without analyzing the legal significance of it is in footnotes 6 of the board's opinion, where it makes the factual assertion that the communication went from the employer rather than from the union. But there's no assessment of the legal consequences of that. It's just a factual assertion. So presumably the entire rationale rests on that footnote. Yes. I mean, that is what the board has given us, and its analysis of why that letter didn't serve the purpose that the company — or doesn't bear the weight that the company seeks to address. And I don't think that the board's brief mentioned that letter, as far as I could tell. And it seems like that's a pretty significant fact, because at that — to carry forward Judge Rogers' hypothetical, suppose the employer had said, I thought it was an authorized strike. I'm now told by the unions that it's not an authorized strike, and the union is not behind this at all and, in fact, is — which is contrary to you about striking. So what I'm going to do is this. I'm going to let all — I'm going to give all you guys this letter, and the ones of you who see the letter and go back to work, hands off. You're good. The ones of you who keep striking, I'm going to discharge you because the strike is not authorized. Well, it's — but, again, it's — I mean, the fact that — maybe I'm splitting hairs here, but the fact that it's unauthorized is conceded. So — Sure. Okay, then — but you have to see a distinction between not authorized and opposed. Yes. So the union opposes the strike, and that — it's hard to — you don't take the position that the letter doesn't reflect union opposition to the strike. You acknowledge that the letter says the union opposes the strike. Yes. Yes, the letter. The letter to the company. Yes, sir. Yeah, the letter. Is that right? Is that right? I didn't understand that because I thought part of your argument later was that the union did not, in fact, oppose the strike. Am I — Well, I'm not exactly — I can't say I remember exactly how we characterized it in our brief or what we see in our brief, but it is evident that the letter that the — But the board's analysis. Yeah. I mean, the board's analysis is that, you know, the union never did anything to tell employees to stop. And that's correct. But that's only because the union didn't directly say it. That's right. Nobody — I don't even think the board disputes that the letter from the union is in opposition to the strike. And that is what I was conceding, Your Honor. It is true that the letter that was communicated to the company states that. There was no communication to the employees to inform them that their position was inconsistent with that of the union. In fact — No direct communication. There was no direct communication. That's right. Now, in what there was — So the board has taken the position that when you elect a representative, you still retain some Section 7 rights. And until that representative tells you directly something, you retain those rights, and then the employer is left with a meaningless letter in terms of its potential Section 8 liability. Well, I don't know that the board has made such a broad statement here because it didn't need to. Because here — I understand, but I'm just trying to understand the board's rationale here, what's going on. Here — I mean, the union can talk out of both sides of its mouth. Well, I mean, the question is whether the employees have the protection. And the employees — what the employees knew is that the union had established demands, and the employees stood by those demands. So the only thing the employer can do is say, I have this letter, and now, union, you must tell your employees that you do not support this strike. Well, I mean, I hesitate to say that's the only course they could take. But that is certainly a course that would address what we discussed earlier about having that direct communication where the union finally disavows, after six weeks of standing by these demands, disavows those demands and makes it evident to the employees. So the next case would be where the employer says, fine, tell your members to stop striking. And the union refuses to do that. That's a hypothetical situation. Yeah. Then the board might resolve the Section 8 liability differently. They might. I mean, it's not — but it also may indicate, hypothetically, of course, that that establishes that the union is not, in fact, taking a position that's inconsistent with the employees. It could be akin to a bargaining — to posturing and bargaining that it's taking with a company, when, in fact, they do support the efforts of their employees to move along bargaining and to bring about the reinstatement of the discharge stewards. It seems like a whole lot turns on what's in footnote 6, what's in two sentences. But is it — actually, it's one sentence with a few commas in it. A one-sentence — it's a one-sentence footnote. And a whole lot turns on that, and all we have is that factual assertion without any explanation of why that's legally consequential. It's rather under-theorized because one's left with the impression that everything turns on the fact that the employer was the one — the employer's security guards were the ones who gave the letter. And we just don't know from the Board's decision why that matters a lot, what's the legal framework within which that matters. Well, it is true that much has to be read into that, but I believe that in the context of the discussion, it is — it's a determination of whether there was an inconsistency, and the Board found that that fact did not — I mean, by implication, that that fact did not establish that there was the type of inconsistency that should strip the employees of their Section 7 rights in favor of the majority principle of 9A. If I could just make a few last-minute points, this is not a case about one right trumping another as the company set forth in its reply brief, of course. It's about reconciling two competing statutes and giving full effect to both when possible. You know, we haven't gotten to the discussion of Miguel Colon or the other arguments that were raised. I'm happy to answer questions. The only thing I'd like to say about Mr. Colon was that we obviously have a slight difference about what the framing of the issue is. This is a strict, substantial evidence matter about what activity he engaged in on September 9th. It's not about expiration of a collective barring agreement. I think there might have been a misreading of the Board's decision on that point. As far as the remedy argument, it was waived about whether there should be adverse tax consequences included. And the final issue is the last-chance agreements that the Board seeks some reinforcement of. The Board clearly set that forth in its order that these last-chance agreements be expunged from the records and that the company cease and desist from encouraging its employees or coercing its employees to do this in the future. And so if the company did not realize that that was before this Court, I think it is plain from the Board's order. So we would seek some reinforcement of that finding as well. And so what's your response to the extraordinary circumstances argument as to the tax consequences? It's in the reply brief. Well, I mean, they say extraordinary circumstances because this case did arise through the posture that, unfortunately, some of our cases have in recent years because of the Noel Canning decision of the Supreme Court. When it went back, at the time the Board issued its decision in order in 2012, the General Counsel had not requested and the Board had not imposed this adverse tax consequence remedy. So in other words, the effect would be that if you have a Noel Canning situation, when the Board says we're starting over, then what happened before has to be ignored. Because here the argument is the employer challenged the original decision, moved for reconsideration. Then we have all this delay waiting for the Noel Canning issue to be resolved. And now the Board comes back and says we're starting all over again, and it adds something that wasn't there before. And all this delay, and yet why in that circumstance, which is unusual, wouldn't that constitute an extraordinary circumstance? Come within that. I would maintain that it would not, Your Honor. I would agree with the characterization, of course, that it is unusual and unfortunate. However, delay in and of itself is not extraordinary. I have a case I could refer the Court to. I was not able to include it in my brief because this was an argument that came up in the reply brief. But it's this Court's decision in Contractor's Labor Pool at 323 F. 3rd, 1051, that says the delay in filing a petition for review or the seeking to avoid a delay in filing a petition for review does not constitute extraordinary circumstances. Oh, right. No, that's quite general. I understand that point. But here, the employer already moved for reconsideration. Then the Noel Canning issue caused this delay. Then the Board starts all over again and adds something. And as I understand it, the position the Board's taking is that, no, you have to file another motion for reconsideration, get the Board to rule on that before you can come to Court. Yes, Your Honor. I mean, as I said, I characterize it as unusual. However, it's not as if this has never occurred before, Noel Canning. Whenever there is a remand, issues go back to the Board. There is a different general counsel and oftentimes, well, not always, but oftentimes a different general counsel and different Board members, and priorities may have changed or the determination of what type of remedies are appropriate may change. And it doesn't alleviate the obligation on the company to allow the Board to address those arguments in the first place. Now, I would also say about the adverse tax consequences that in my research preparing for today's argument, I wasn't able to find any situation in which a party has actually raised substantive arguments about the adverse tax consequence to the Board. This was a change in priorities for the general counsel. And so the Board has not addressed this Court's decision in fog or the other type of arguments that the company has raised. And so without doing so, we maintain that the Court doesn't have jurisdiction to consider that argument under 10D. Thank you. Thank you for the additional time. Thank you. Please, the Court. Well, just to clarify, Judge Royers, the dissident member, Mr. Johnson, called the group. No, I know it's in the dissent. I asked about the Board's priority. Okay. Thank you. What I would like to add is that the October 20th letter between my company and the union certainly shows that a wildcat strike undermined the union and was inconsistent with the strategy that the union was pursuing at that point in time, which, as my client's letter said, was not to strike at that time. We think the Board is basically eviscerating Section 9 by creating a presumption that a wildcat strike is a protected action as long as the goals of the strikers are generally those of the union. We don't think that's what the Emporium case calls for. Did the company, this is a factual question, but did the company consider asking the union to tell the employees to stop striking? Can you repeat the question? In other words, and when the company gets the letter from the union that says that the union is opposed to the strike. Yes. Did the company, why didn't the company tell the union then, well, tell the employees to stop striking? Why did the company give the letter directly to the employees, to the security guards, instead of? I wasn't there, but, you know, they were negotiating. They had agreed not to strike, and they were surprised. I think there's, on the record, Mr. Prieto said both the union and the company said, what's going on? We were negotiating, and all of a sudden we have a strike. So the attorney basically sent the letter to the union. Hey, this is not what we agreed to. What's going on? And the union responded, this is not my doing. This is the small group. And then my client had it distributed to each and every employee. Yeah, I don't mean to suggest. For that notice, why they didn't do it another way, why didn't the? I don't mean to suggest another way should have necessarily happened. I just didn't know whether there was some fact that would tell us. I think they were reacting to an emergency situation, you know, stop it. You know how a strike has something that they were not expecting precisely because it was a wildcat strike. And I think that's why we are also requesting, or I think what we're saying in a sense is that Emporium really calls for wildcat strikes to be per se legal. I mean, there in Emporium, the picketers had the same goals as the union. They both wanted to avoid racial discrimination, except the union did it through the adjustment board, and the picketers wanted to do it through picketing. And the picketers specifically requested an exception, that the court create an exception to the principle of exclusive representation in cases of racial discrimination. And the court rejected it. The court rejected it. The court said, no, you know, the exclusive representation is so important that if we allow, even for such incredible goals as to avoid racial discrimination, that the employees can go and picket irrespective of what the union wants to do, that's not permissible under Section 9. There were other remedies, of course, under Section 7, but it says it's not permissible under Section 9. It specifically said that's going to, I quote, even if in actual bargaining the various groups do not perceive their interests as divergent and further subdivide themselves, the employer would be bound to bargain with them in a field largely preempted by the current collective bargaining agreement. In other words, you can't have the union negotiating here in a subgroup, even for the same goal, doing something different somewhere else. It's just not what the Section 9 calls for. Indeed, in Catwell, the court, and I quote, also said that the court below, in the same way as the board did in this case, minimized the impact on the union by noting that it was not working at cross purposes with the dissident. It rejected that argument. So what we think Emporium calls for, and I think the Fournell versus NLRB case of this court, is that wildcat strikes should be per se legal. There is no difference, we think, in the violation of the Section 9 exclusivity principle, and in the case of Fournell, a no-strike clause. The ultimate goal of preserving the exclusive principle and avoiding what happened in this case, which is a subgroup basically taking over for the union, is what Section 9 requires, and that's why we asked this court to reverse the board. Thank you very much. We'll take the case under advisement.
judges: Rogers, Griffith, Srinivasan